## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 90-CA-01182-SCT

*SOUTHWEST MISSISSIPPI REGIONAL MEDICAL CENTER*

*v.*

*MRS. JUEDELL T. LAWRENCE AND MISSISSIPPI HOSPITAL EMPLOYEE BENEFIT TRUST*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/18/90 |
| TRIAL JUDGE: | HON. JOE N. PIGOTT |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ROBERT W. BRUMFIELD |
| | ARMIN J. MOELLER, JR. |
| | DAVID M. THOMAS, II |
| ATTORNEYS FOR APPELLEES: | PAUL M. NEVILLE |
| | T. MACK BRABHAM |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND RENDERED IN PART - 12/5/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 3/21/97 |

**EN BANC.**

**ROBERTS, JUSTICE, FOR THE COURT:**

¶1. This is an appeal from a judgment rendered by the Circuit Court of Pike County, Mississippi following a five-day jury trial and a verdict for the plaintiffs, Mrs. Juedell T. Lawrence and the Mississippi Hospital Employee Benefit Trust. The case involves the Southwest Mississippi Regional Medical Center's refusal to pay Mrs. Lawrence's medical expenses for allegedly job-related injuries, as provided in the Hospital's employee handbook. The Hospital filed a Motion for Partial Summary Judgment on July 31, 1989, as to the issue of whether or not the employee handbook was in fact a contract. The lower court overruled the motion on September 12, 1989, and pursuant to Rule 56(h) of the Mississippi Rules of Civil Procedure, awarded what it deemed to be reasonable expenses

($100) and attorney's fees ($750) to Mrs. Lawrence as the prevailing party.

¶2. The jury awarded Mrs. Lawrence $66,000 actual damages, $50,000 damages for mental anguish, and $100,000 punitive damages. The jury also awarded Mississippi Hospital Employee Benefit Trust $18,144.43. Feeling aggrieved, Southwest Mississippi Regional Hospital, the defendant below, appealed to this Court assigning as error:

## I.

**Whether or not the lower court erred in ruling that the Appellant contracted with the Appellee, Juedell T. Lawrence, to provide her with workers' compensation benefits?**

## II.

**Whether or not the lower court erred in awarding sanctions against the Appellant on the Motion for Partial Summary Judgment?**

## III.

**Whether or not the lower court erred in admitting the financial statements of the Appellant; instructing the jury on punitive damages and permitting the jury to consider punitive damages?**

## IV.

**Whether or not the jury verdict was against the overwhelming weight of the evidence?**

## V.

**Whether or not the lower court erred in permitting the appellee's expert witness, Dr. David Roos, to testify to matters which went beyond the response of the Appellant's interrogatory answers relating to this expert witness's testimony?**

¶3. Finding that the facts do not support an award of punitive damages in this case, we reverse on that issue. Alternatively, if punitive damages were affirmed, the award should only be allowed to the extent of the insurance coverage in existence. Finding no other reversible error, we affirm on all other issues.

## STATEMENT OF THE FACTS

¶4. Mrs. Juedell Lawrence, the appellee, was employed by Southwest Mississippi Regional Medical Center (Southwest) in December, 1983. Mrs. Lawrence was hired as an x-ray secretary. At the time of her employment, Lawrence did not receive an Employee Handbook because there were not enough handbooks available. She did, however, receive one at a later date. Lawrence attended an orientation and signed a certificate to that effect on January 16, 1984. The orientation certificate

stated:

> This is to certify that I have attended the SMRMC orientation program and have toured the facility. The policies of the Employee Handbook have been explained to me, and I have had the opportunity to ask questions regarding the policies and procedures of this hospital. I feel that I understand the policies and procedures governing employment at SMRMC. I expect to be evaluated by my supervisor on an annual basis and to be governed by the policies presented to me. I will do my best to be a contributor to the total patient care goal of the medical center.

When Lawrence did receive a copy of the Employee Handbook, she was asked to sign another certificate. It stated:

> This is to certify that I have received a copy of the November 1983 employee handbook of Southwest Miss. Regional Medical Center. I also certify that I will read this handbook and as a condition of my employment with this hospital abide faithfully by the rules of this handbook as well as other rules and regulations of the hospital.

This certificate was signed and dated on March 15, 1984.

¶5. Lawrence's duties as an x-ray secretary included typing reports and pulling and filing patients' x-rays. Lawrence's work week varied, as did the hours she worked each day. Mr. Ben Hunt, Lawrence's immediate supervisor at Southwest, testified that Lawrence was one of three full-time x-ray secretaries. Mrs. Bessie Welch-Kinnerman was also employed as a full-time x-ray file clerk, and she did the majority of the filing of the x-rays.[1] Mr. Hunt described the x-ray department as having three filing areas. One filing area was in the secretaries' office, storing the current files alphabetically of patients in the hospital. The other two filing areas were downstairs in the basement area. The three full-time secretaries, including Lawrence, would only retrieve files from the basement when Mrs. Welch-Kinnerman was at lunch or on a break during the regular work week. On the weekends, the secretaries would retrieve the files, but there was no filing done.

¶6. Mr. Hunt also described the physical layout of the x-ray department with use of photographs depicting the work space offered by Southwest. Mr. Hunt described the alphabetical file in the secretaries' office as being five shelves high. He testified to the specific measurements: from the floor to the bottom of the first shelf is 18 ½ inches. Although not consistent with the specific meaurements given, Hunt testified that the shelves are six inches apart. The second shelf is at 34 ½ inches; the third shelf is at 50 ½ inches; the fourth shelf is at 56 ½ inches; and the top shelf is 82 ½ inches from the floor; however, the measurement from the floor to the bottom of the top file is 66 ½ inches. Mr. Hunt also testified that there was a nine-inch high step stool available for use by the secretaries when pulling files from the top shelf.

¶7. Mr. Hunt also described the physical attributes of the basement area where x-rays were stored. There were two filing systems downstairs, referred to as the basement and seatrain. The filing systems in both the basement and seatrain were five shelves, and in a few places, six shelves high. The measurements in both are virtually identical to the shelves upstairs in the secretaries' department. There were also 25 ½ inch step ladders downstairs for use in reaching the top shelves in both areas.

¶8. The onset of the symptoms related to this cause that led Lawrence to seek medical assistance

began in December 1985.[2] She testified that she began to notice that she dropped things for no reason. She also experienced numbness, swelling, and a change of color in her hands. Lawrence stated that it was painful for her to use her fingers while typing. The condition got progressively worse.

¶9. Lawrence went to see Dr. Hensarling, a specialist in rheumatology, in December 1985. According to Lawrence, the doctor prescribed anti-arthritic drugs. In March 1985, Dr. Hensarling saw Lawrence again and thought she suffered from carpal tunnel syndrome. Lawrence was admitted to the Methodist Rehabilitation Center in Jackson, Mississippi, for treatment of this condition. She left the hospital against medical advice without receiving the surgery recommended by Dr. Hensarling.

¶10. Lawrence next saw Dr. Gandy in Jackson, Mississippi. Dr. Gandy also diagnosed possible carpal tunnel syndrome. He prescribed splints for Lawrence to wear at all times. Lawrence testified that the pain got worse. She next saw Dr. Meyer, a physician on staff at Southwest. Dr. Meyer referred Lawrence to Dr. Ansel Tipton, a neurologist in Jackson, Mississippi. Dr. Tipton conducted some tests on Lawrence and referred her to Dr. Leon Parks, an oncologist and thoracic surgeon in Brandon, Mississippi.

¶11. Dr. Parks diagnosed Lawrence as suffering from thoracic outlet syndrome and performed thoracic outlet surgery on her right and left side upper extremities. The surgery on the right side was performed in April 1986, and the surgery on the left side was performed in June 1986. Lawrence testified that she had restrictions placed on her activities following the surgery, such as no driving, sweeping, mopping, lifting, and that she was told to stay out of the kitchen area of the house. She stated that the restrictions had not been lifted as of the date of the trial. She admits that there has been some improvement and that she drives in case of emergencies, and fixes sandwiches for her children occasionally, but that when she tried to type, she had no control of her fingers.

¶12. Lawrence was asked at trial to read into evidence a letter written from Dr. Leon Parks to Mr. Ben Hunt, Lawrence's supervisor at Southwest, dated May 12, 1986. The portion of the letter read into evidence at trial was:

> The Lawrence's [sic] have requested that I comment upon the relationship between the findings at surgery and her occupation. The pathology encountered, specifically the very bulk scalenus medius muscle, is characteristic of thoracic outlet syndrome, caused by or associated with repetitious upper extremity activity, such as typing and filing. The difficulty can be seen when the objects being handled or filed are quite light and the probability of a lifting activity inducing thoracic outlet syndrome increases with the weight of the objects being repetitiously lifted, particularly to an overhead position. Thus, the findings are quite consistent with the repetitious filing of X-ray jackets which often are quite heavy and somewhat cumbersome. Therefore, I do feel it proper to state that her thoracic outlet syndrome is related to her employment activities.

¶13. Lawrence sought workers' compensation benefits from Southwest. Southwest is not covered under workers' compensation, but rather, is self-insured. However, the Employee Handbook states that employees will be compensated for on-the-job injuries up to the coverage provided in the Workers' Compensation Act.

¶14. Lawrence testified that she received a letter terminating her employment with Southwest in

response to her claim for workers' compensation benefits. The letter, dated July 28, 1986, stated:

> Dear Mrs. Lawrence:
>
> After carefully reviewing the facts surrounding your claim of an on-the-job injury along with your medical records, the Administration of this hospital has determined that your physical condition which needed surgery to correct was not caused by your employment at Southwest Medical Center. As a result of the above determination, we are now terminating your employment in full along with all benefits effective immediately. This is in accordance with our policy on reinstatement following an illness (Section D-4h) p. 15 of the employee handbook. This states that we will hold an employee's job for a period not to exceed sixty days from the date of illness, and after the sixty days, the employee's position may be filled permanently. Because you have been out in excess of sixty days and because of the heavy workload in the X-ray Department, we have no choice but to take this action. If you have any questions concerning any of the above, please contact the personnel director.
>
> Sincerely, Norman Price

¶15. Lawrence testified that she was devastated as a result of the denial of benefits and the termination of her employment. She stated: "I was worried about where the money was coming from for different items. I was depressed and agitated." Lawrence further stated that she was worried because there was no insurance to cover anything else that might occur, nor to cover house payments, and money in general, as she had been the sole breadwinner. Over defense counsel's objection, Lawrence stated that as a result of all of this, she and her family lost their house. Lawrence and her family lived off her husband's social security benefits.[3] Lawrence applied for and was awarded full benefits for total disability from the Social Security Administration on August 19, 1987.

¶16. The complaint in this case was filed April 1, 1987, in Amite County Circuit Court. Southwest moved for and was granted a change of venue to Pike County. On May 7, 1987, the court granted an order on Southwest's motion holding this cause in abeyance until Lawrence's claim before the Workers' Compensation Commission was finally resolved. The Workers' Compensation Commission declined to hear the case for lack of jurisdiction.

¶17. As a result of Lawrence's employment by Southwest, she was covered under the Medical Benefits Plan provided by Mississippi Hospital Employee Benefit Trust (MHEBT) to the hospital's employees. Some of the hospital and medical bills that Lawrence incurred while still employed at Southwest were paid through the hospital by MHEBT, a co-plaintiff in this case. There were some bills that were not paid by MHEBT and were either paid by Lawrence, or remained outstanding at the time of trial. Lawrence submitted medical bills in the amount of $20,116.88 to MHEBT, of which the amount of $18,335.93 was paid on her behalf. MHEBT filed a complaint of intervention against Southwest on November 17, 1988, seeking subrogation to the right of recovery by Lawrence to the extent of the payments made by MHEBT on behalf of Lawrence, as well as court costs.

¶18. On July 31, 1989, Southwest filed a Motion for Partial Summary Judgment, pursuant to Miss. R. Civ. P. 56, on the issue of liability for damages of breach of contract and for grounds that there was no genuine issue as to any material fact on the matter of breach of contract. Southwest relied on the affidavit of Southwest's personnel director and a copy of the Employee Handbook. Lawrence

filed a response to Southwest's Motion for Partial Summary Judgment and also moved for attorney's fees, expenses and sanctions on this matter. A hearing on Southwest's Motion for Partial Summary Judgment was held on August 21, 1989. Following that hearing, Lawrence filed a Motion for Sanctions to Strike Defendant's Defenses and Enter Judgment for Fraud on August 28, 1989. The court overruled the Motion for Partial Summary Judgment on September 12, 1989. The court awarded Lawrence reasonable expenses for attending the hearing in the amount of $100, and found that the Motion was without reasonable cause and awarded Lawrence what it deemed were reasonable attorney's fees in the amount of $750.

¶19. Southwest filed a Motion to Reconsider Summary Judgment Order on September 18, 1989. After a five-day trial, the jury returned a verdict in favor of Lawrence and the MHEBT. Lawrence was awarded $66,000 actual damages, $50,000 for mental anguish and $100,000 for punitive damages. MHEBT was awarded $18,144.43. The jury was polled at the request of Southwest. The verdict was unanimous. The lower court entered a judgment for the jury awards, plus costs and interest from the date of the award until paid. The court also ordered that Lawrence "shall have recourse only to the proceeds or right to proceeds of any liability policy covering the Defendant for such damages if any" as to the award for mental anguish and punitive damages. The trial court also overruled Southwest's motion to reconsider its prior ruling on its summary judgment on October 22, 1990.

¶20. Southwest moved for the lower court to set aside the jury verdict and the judgment of the court, and enter judgment for the defendant, and to enter a directed verdict in favor of Southwest, or in the alternative, to grant a new trial. The court overruled the motion. Southwest filed a timely appeal with this Court. Lawrence filed notice of a cross-appeal to this Court from the part of the final judgment that limits her recovery to existing insurance coverage. The cross-appeal was not briefed to this Court, and we do not consider it.

## DISCUSSION OF THE ISSUES

### I.

**THE LOWER COURT CORRECTLY RULED THAT SOUTHWEST CONTRACTED WITH JUEDELL LAWRENCE TO PROVIDE HER WITH WORKERS' COMPENSATION BENEFITS, OR THE EQUIVALENT THEREOF**

¶21. Southwest contends that the Employee Handbook, effective November 22, 1983, and issued to every employee, does not constitute a contract. As such, it gave no contractual right to benefits or continued employment to Lawrence. Specifically, Southwest points to two sections in the Employee Handbook that state that nothing in the Handbook should be considered a guarantee to continued employment or benefits. The first such disclaimer occurs under the caption "Policy Revisions," and states:

> The policy and procedures described in this booklet are subject to being modified, revoked, terminated or changed in whole or in part, at any time, with or without notice by the Administrator subject only to the approval of the Board of Trustees of the Southwest Mississippi Regional Medical Center. Nothing in this booklet should be considered a guarantee

of continued benefits or employment by Southwest Mississippi Regional Medical Center.

Also, under the caption "Epilogue," the Handbook further disclaims:

> No one booklet of policies can cover every situation that may arise, and nothing in this booklet should be considered a guarantee of continued benefits or employment by Southwest Mississippi Regional Medical Center. If you need further information or are in doubt about how any of these policies apply to you, you are invited to ask your Supervisor or Department Head. He will answer your questions or get answers for you.

Southwest contends that the Employee Handbook, by its own terms, was clearly not a contract, and that Lawrence had no guarantee or contractual right to any of the benefits outlined therein. Moreover, Southwest contends that Lawrence could not consider the handbook a contract since she did not receive a copy of it until she had been employed at Southwest for three months. Southwest also contends that there was no binding contract between Lawrence and Southwest since she did not provide any consideration for a binding contract.

¶22. Lawrence, on the other hand, contends that one of the important factors in her decision to accept employment with Southwest were the benefits. She stated that she understood that these benefits included workers' compensation benefits, which were especially important to Lawrence because she was the sole breadwinner for her family. Lawrence was required to go through an orientation, and sign a document which stated that she had in fact gone through such an orientation. When the handbooks were received from the printer, and Lawrence received her copy, she was again required to sign a document attesting that she had received, and that she would read, the handbook.

¶23. Lawrence points out that this is not a termination of employment case, although her employment with Southwest was terminated. Lawrence seeks the workers' compensation benefits, or their equivalent, as provided in Southwest's Employee Handbook:

> In the event that an employee is injured while on duty, the Medical Center will provide immediate Emergency Room care. All injuries will be reported through the proper department head or Supervisor to the Administrative Council member immediately, and followed by a written report (incident report) within 24 hours. *SMRMC will cover up to Mississippi workmen's [sic] compensation benefits for all compensable injuries within the meaning of the Mississippi Workmen's [sic] Compensation Act . . . .*(emphasis added).

In addition, Southwest stipulated that the promises made to Lawrence relating to benefits were those set forth in the Employee Handbook. Southwest's hospital administrator, Norman Price, admitted on cross-examination that it did not matter at what point Lawrence obtained the handbook as to what coverage she would be entitled.

¶24. Southwest contends that the law of Mississippi mandates that a unilaterally promulgated employee handbook does not by itself constitute a contract between the employer and employee. Southwest correctly states that this Court has held "that a written contract can be modified by a policy handbook which then becomes part of the contract, but only where the contract expressly provides that it will be performed in accordance with the policies, rules, and regulations of the employer." **Perry v. Sears, Roebuck & Co.**, 508 So. 2d 1086, 1088 (Miss. 1987) (*citing **Robinson v.***

***Bd. of Trustees of East Central Junior College***, 477 So. 2d 1352, 1353 (Miss. 1985)). However, in a recent case, this Court spoke further on the question of employee handbooks.

¶25. In ***Bobbitt v. The Orchard, Ltd.***, 603 So. 2d 356 (Miss. 1992), the lower court granted summary judgment to the employer because the court found that there was an employment contract terminable at will. The Employee Manual had outlined the mutual responsibilities of the employer and the employees. An employee was fired for what was characterized by the employer as insubordination. It was the employee's first infraction, and the Employee Manual had provided that an employee should receive counseling and a formal written warning upon the first infraction. This Court held that because the employer gave the manual to all employees, it became a part of the employment contract. The Court found that it did not give tenure, nor create a right to employment for a definite length of time, but that the employer had an obligation to follow the provisions covered within the manual. ***Id.*** at 361. The Court did note that the lack of any express disclaimer or contractual provision in the manual did not affect the employer's right to terminate the employee at will. ***Id.*** at 362. This Court stated further "that a personnel manual 'can create contractual obligations, even in the absence of a written agreement.'" ***Id.*** at 361 (*quoting **Perry**, supra* at 1088).

¶26. In an unrelated case involving Southwest, the Fifth Circuit held that the two disclaimers in the Employee Handbook discussed above cannot be read to limit Southwest's power to terminate its employees-at-will. ***Johnson v. Southwest Mississippi Regional Medical Ctr.***, 878 F.2d 856 (5th Cir. 1989). ***Johnson*** involved a termination of employment case. The Fifth Circuit noted that Southwest could be accused of duplicity by setting forth in the handbook such extensive rights, rules, and procedures, which are subject to change without notice. ***Id.*** at 860. The case ***sub judice*** does not involve a termination case, but whether an employer can deny workers' compensation benefits to an employee as set forth in an employee handbook.

¶27. Southwest's position is disingenuous. In the letter Southwest wrote to Lawrence in response to her claim for workers' compensation benefits, the hospital administrator told her that because she did not suffer an on-the-job injury, her injury was not compensable. The administrator did not tell Lawrence that the handbook was not a contract and that she could not rely on the benefits spelled out in the handbook.

¶28. The Mississippi Workers' Compensation Act provides that any employer who has five or more employees must provide coverage. Alternatively, an employer who qualifies can elect to be self-insured, as Southwest did. § 71-3-5 Miss. Code Ann. (Supp. 1992).

¶29. We find that Southwest specifically took itself out of workers' insurance compensation coverage when it became self-insured; however, it did not take itself out of the business of providing workers' compensation coverage to its employees when it specifically stated that the employees would be covered for what would in effect be a compensable injury under the Workers' Compensation Act in an employee handbook they provided to every employee. Southwest is bound by the promise of such coverage.

¶30. Accordingly, we find this assignment of error is without merit.

**II.**

## THE TRIAL COURT DID NOT ERR IN AWARDING SANCTIONS IN THE FORM OF ATTORNEY'S FEES IN FAVOR OF LAWRENCE FOR SMRMC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

¶31. Southwest contends that the lower court erred in awarding attorney's fees to Lawrence, pursuant to Miss. R. Civ. P. 56(h).

¶32. Southwest moved for partial summary judgment in this case, based on its contention that it had reasonable cause to believe that the Employee Handbook did not rise to contractual standards and therefore, felt that a motion for summary judgment on this issue was justified.

¶33. Rule 56(h) states:

(h) Costs to Prevailing Party When Summary Judgment Denied. If summary judgment is denied the court shall award to the prevailing party the reasonable expenses incurred in attending the hearing of the motion and may, if it finds that the motion is without reasonable cause, award attorneys' fees.

The comment to this rule states:

Subsections (b) and (h) are intended to deter abuses of the summary judgment practice. Thus, the trial court may impose sanctions for improper use of summary judgment and shall, in all cases, award expenses to the party who successfully defends against a motion for summary judgment.

¶34. The trial court awarded Lawrence $100 in expenses for prevailing in the motion for summary judgment. Southwest does not challenge this award. The language in Rule 56(h) is explicit on that matter. However, Rule 56(h) is discretionary as to the award of reasonable attorney's fees. The comments to the rule indicate that its purpose is to "deter abuses of summary judgment practice." *See also* ***Brown v. Hartford Ins. Co.***, 606 So. 2d 122, 127 (Miss. 1992); ***Lamb Const. Co. v. Town of Renova***, 573 So. 2d 1378, 1384 (Miss. 1990); ***Cooper v. State Farm Fire & Casualty Co.***, 568 So. 2d 687, 692 (Miss. 1990).

¶35. The cases decided by this Court relating to Rule 56(h) are not instructive in the case *sub judice*. In ***Brown***, summary judgment was granted, thereby making an award of attorney's fees inappropriate under the stated purposes of the rule. ***Brown***, 606 So. 2d at 127. In ***Lamb Const. Co.***, as there was no evidence in the record as to attorney's fees, this Court found there was no merit to the cross-appeal for attorney's fees and costs. ***Lamb Const. Co.***, 573 So. 2d at 1384. The same occurred in ***Cooper***. The record did not contain a transcript of the summary judgment hearing, so there was no record of proof of reasonable expenses and attorney's fees. This Court held that the cross-appeal was without merit. ***Cooper***, 568 So. 2d at 692.

¶36. Lawrence's attorney made a record of the fees charged in the preparation and successful defense of the summary judgment motion.[(4)] Unlike the previous cases, we must look to see if the trial judge abused his discretion in awarding attorney's fees; that is, whether the motion was without reasonable cause. ***Bankston v. Pass Road Tire Ctr., Inc.***, 611 So. 2d 998, 1010 (Miss. 1992) (*citing* ***Nationwide Mutual Ins. Co. v. Evans***, 553 So. 2d 1117, 1119 (Miss. 1989); ***Burkett v. Burkett***, 537

So. 2d 443, 446 (Miss. 1989); *Detroit Marine Eng'g v. McRee*, 510 So. 2d 462 (Miss. 1987)).

¶37. Southwest analogizes this situation to cases in which Miss. R. Civ. P. 11 sanctions have been opposed. This Court has stated that the mere denial of a claim on the merits is insufficient by itself to warrant the imposition of Rule 11 sanctions. Not only must the claim be without merit, it must also be frivolous. *Tricon Metals & Services, Inc. v. Topp*, 537 So. 2d 1331, 1335 (Miss. 1989) (*citing Dethlefs v. Beau Maison Development Corp.*, 511 So. 2d 112, 118 (Miss. 1987)).

¶38. Here, Southwest had an extensive history of claiming that the document in question had contractual properties when it could be used to its benefit in employee disputes. Its position here and in the trial court is disingenuous. We therefore find that the award of attorney's fees in this case was not an abuse of discretion, and affirm the lower court.

### III.

### WHETHER THE LOWER COURT ERRED IN ADMITTING THE FINANCIAL STATEMENTS OF THE APPELLANT; INSTRUCTING THE JURY ON PUNITIVE DAMAGES AND PERMITTING THE JURY TO CONSIDER PUNITIVE DAMAGES.

¶39. The issue here is whether Southwest, as a community hospital defined in Miss. Code Ann. § 41-13-10(c) (1993), can be liable for punitive damage under the principles of sovereign immunity. A community hospital, in its discretion, may obtain liability insurance coverage out of its operating funds. Miss. Code Ann. § 41-13-11(2) (1993). For actions arising prior to October 1, 1993, if liability insurance is in effect "immunity to suit is only waived to the extent of such liability insurance available to satisfy any judgment rendered . . . ." Miss. Code Ann. §41-13-11(2). From and after October 1, 1993, immunity "shall be waived only to the extent of the maximum amount of liability provided for in Section 11-46-15." Miss. Code Ann. §11-46-5. *See also* Miss. Code Ann. § 41-13-11(4) and (5) (1993).

¶40. Although the jury awarded Lawrence much in the way of damages, the court limited recovery of these funds to the amount of the insurance coverage held by Southwest. During the course of this litigation, Virginia Insurance Reciprocal, Southwest's insurance carrier, refused to defend this action and claimed that Southwest was not covered in this action.[(5)]

¶41. Apparently, Lawrence sued Virginia Insurance Reciprocal (VIR), and the case was removed to the United States District Court, Southern District of Mississippi. Lawrence brought her action against VIR based on the fact that she had prevailed in this case against Southwest at the trial level. She sought to recover mental anguish and punitive damages. The District Court entered summary judgment in favor of VIR, and Lawrence appealed. The Fifth Circuit found that the appeal, basically, turned on whether an insurer, which did not defend the underlying action against its insured, is barred from asserting sovereign immunity when called to defend itself in a garnishment action by the plaintiff from the prior action. To answer this question, the Fifth Circuit applied and interpreted Mississippi law. *Lawrence v. Virginia Ins. Reciprocal*, 979 F.2d 1053, 1054 (5th Cir. 1992). They found that VIR was not barred from raising sovereign immunity as a defense.

¶42. Turning next to whether punitive and mental anguish damages are recoverable to the extent of

the insurance coverage under Mississippi law, the *Lawrence* Court found that recent developments in Mississippi law did not apply to the case before them.[(6)] *Lawrence* focused on whether Southwest was authorized under the governing statute to purchase coverage for punitive and mental anguish damages. The federal court found that Southwest was not authorized to purchase insurance coverage for punitive damages. The basis for this opinion was that the purpose of punitive damages was to punish; and therefore, punitive damages did not fall into the category of damages insurable under the statute.[(7)] *Id.* at 1057. On the other hand, the Court found that mental anguish damages could be awarded upon a finding of simple negligence in breach of contract cases, and therefore reversed and remanded for further proceedings on that issue. *Id.*

¶43. In *Churchill v. Pearl River Basin Dev. Dist.*, 619 So.2d 900 (Miss. 1993), this Court overruled a line of cases that stood for the principal that a governmental entity did not waive sovereign immunity simply by purchasing liability insurance without express statutory authority. *See Strait v. Pat Harrison Waterway Dist.*, 523 So. 2d 36 (Miss. 1988); *Joseph v. Tennessee Partners, Inc.*, 501 So. 2d 371 (Miss. 1987); *French v. Pearl River Valley Water Supply Dist.*, 394 So. 2d 1385 (Miss. 1981), *overruled by Churchill*, 619 So.2d 900 (Miss. 1993).

¶44. Punitive damages are to punish a wrong-doer. In the case of a community hospital, or any other governmental entity for that matter, the "punished" is the taxpayer, as it is their funds that pay the damages, or the insurance coverage for such damages. With that in mind, litigants should not be allowed to obtain punitive damages from the public treasury which is filled only by taxpayers. However, by statute, sovereign immunity is waived to the extent of insurance obtained. Miss. Code Ann. § 41-13-11(2). We have held that where insurance has been obtained to cover liability for damages or injury to persons or property that insurance also covers punitive damages as governed by the policy. *Old Security Cas. Ins. Co. v. Clemmer*, 455 So.2d 781,783 (Miss. 1984); *Anthony v. Frith*, 394 So.2d 867, 868 (Miss. 1981). Accordingly, even though tax payers should not have to bear the burden of paying a punitive damages award assessed a governmental entity, neither should an insurance company be allowed to retain premiums and avoid the liability where insurance has been purchased to cover such damages. In the case at bar; however, we do not believe the facts support a punitive damages award against Southwest. For that reason, we reverse the award of punitive damages. Alternatively, were punitive damages affirmed, the award should only be allowed to the extent of the insurance coverage in existence.

## IV.

### THE VERDICT OF THE JURY THAT LAWRENCE'S WORK-RELATED ACTIVITIES CAUSED OR CONTRIBUTED TO HER INJURY WAS NOT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE

¶45. The well-established standard of review for an appellant's claim that a civil verdict is against the overwhelming weight of the evidence was stated by this Court in *Bobby Kitchens, Inc. v. Mississippi Ins. Guar. Assoc.*, 560 So. 2d 129 (Miss. 1989):

This Court will not set aside a jury verdict unless it is against the overwhelming weight of the evidence and credible testimony. *Adams v. Green*, 474 So. 2d 577, 581 (Miss. 1985). The jury is the judge of the weight of the evidence and the credibility of the witnesses. *Jackson v.*

*Griffin*, 390 So. 2d 287, 289 (Miss. 1980). Because of the jury verdict in favor of the appellee [Lawrence], this Court resolves all conflicts in the evidence in [her] favor. This Court also draws in the appellee's favor all reasonable inferences which flow from the testimony given. *City of Jackson v. Locklar*, 431 So. 2d 475, 477 (Miss. 1983). This court must assume that the jury drew every permissible inference from the evidence offered in favor of the appellee. *Burnham v. Tabb,* 508 So. 2d 1072, 1077 (Miss. 1987).

*Bobby Kitchens, Inc.*, 560 So. 2d at 131.

## A.

¶46. Resolving all conflicts in favor of Lawrence, there is substantial evidence to support the jury's verdict in favor of Lawrence regarding her employment at Southwest as a contributing factor to her injuries and that she was entitled to the equivalent of workers' compensation coverage. While there was conflicting testimony between the expert witnesses in this case, the jury chose to believe Lawrence's expert witnesses, Dr. Parks and Dr. Roos, over Southwest's expert witness, Dr. Sessions. Using this same standard of review there is also sufficient evidence to support an award of damages for mental anguish.

¶47. Southwest contends that Lawrence's secretarial duties in her employment with the hospital were general in nature. Furthermore, the filing of the x-rays was not repetitious enough to cause her injuries. Southwest also points out that Lawrence engaged in heavy physical activities, i.e. contributed to the actual building of her home, including helping with the roofing, prior to her employment with Southwest. There is some conflict regarding exactly how much work Lawrence did on the house.

¶48. The major conflicting testimony was provided from the expert witnesses. Dr. Leon Parks, an expert in thoracic outlet syndrome, was one of Lawrence's treating physicians. Dr. Parks testified that because of her various complaints, for example, numbness and pain in both extremities, and swelling in her hands, he diagnosed Lawrence as suffering from thoracic outlet syndrome.

¶49. Dr. Parks operated on Lawrence twice for thoracic outlet syndrome. Although Dr. Parks wrote to Southwest after the surgeries that he felt she could go back to her job with some modifications of duties, he later changed that finding. When he saw Lawrence ten months after surgery and the problems she complained of persisted, he wrote in a report that he now felt that the problems may not improve with time. He also wrote in his report:

> I feel that the probability of major improvement of her symptoms from those now present is perhaps 10 to 20 percent at best. Furthermore, I feel that even this relatively modest chance of major recovery in the future would be lost if the patient were forced by circumstances to return to activity requiring active use of her upper extremities.

Dr. Parks did state that a woman of Lawrence's physical build was predisposed to thoracic outlet syndrome, and that some of her continued post-operative symptoms could be caused by her significant obesity. Dr. Parks testified that Lawrence suffered a thirty percent (30%) permanent impairment in relation to the medical problems for which he had been treating her.[8] Dr. Parks also gave his opinion as to what limitations to her physical activity Lawrence could expect to continue as

a result of this partial permanent disability.[9] He felt that any repetitious use of her upper extremities for even "light" work would likely be too difficult for her; and, it would not be possible for her to go back to the kind of work she did at Southwest.

¶50. Dr. Parks was also asked to give his opinion as to the cause of the onset of the symptoms of thoracic outlet syndrome. He opined that it was work-related and specifically related to her employment at Southwest. The lifting of x-rays, especially over her head, filing x-rays and reports, and typing were all causes of Lawrence's thoracic outlet syndrome trouble.

¶51. The deposition of David Roos was read into evidence. Dr. Roos, an expert and pioneer of sorts[10] in thoracic outlet syndrome, did not personally treat or examine Lawrence. He was provided with various reports, records, and notes pertaining to the treatment of Lawrence. Dr. Roos basically established that Dr. Parks' diagnosis and treatment was correct: that Lawrence suffered from thoracic outlet syndrome and that it was caused by her employment. Dr. Roos was also of the opinion that Lawrence could not go back to her former employment.

¶52. Southwest called Dr. Robert Sessions as its expert witness. Dr. Sessions did not personally examine Lawrence, but relied on various reports and depositions from treating physicians and records and x-rays. Based on his examination of those records, Dr. Sessions opined that Lawrence's work-related activities at Southwest did not cause or aggravate her thoracic outlet syndrome. Dr. Sessions based this opinion on the fact that he looked at the big picture, not just individual things. He said her job at Southwest was a continuation of her life work, and thus, the everyday tasks done by Lawrence were indistinguishable for purposes of determining what caused her thoracic outlet syndrome problems. Furthermore, it was Dr. Sessions' opinion that Dr. Parks did not properly perform the Roos procedure when he operated on Lawrence, thereby adding to her continuing problems.

### B.

¶53. We turn now to Lawrence's award of damages for mental anguish. This Court traditionally held that emotional distress and mental anguish damages are not recoverable in a breach of contract case in the absence of a finding of a separate independent intentional tort. *Life & Casualty Ins. Co. v. Bristow*, 529 So.2d 620, 624 (Miss. 1988); *Blue Cross & Blue Shield, Inc. v. Maas*, 516 So.2d 495, 498 (Miss. 1987); *Aetna Casualty & Surety Co. v. Day*, 487 So.2d 830, 835 (Miss. 1986); *State Farm Fire and Casualty Co. v. Simpson*, 477 So.2d 242, 250 (Miss. 1985).

¶54. In recent years this Court has moved away from this requirement. In *Strickland v. Rossini*, 589 So.2d 1268, 1275 (Miss. 1991), we stated:

> The rule once was that, to recover damages for emotional distress, the plaintiff had to prove either (a) an intentional or at least grossly negligent tort or (b) negligence accompanied by physical impact. The Court has relaxed this rule in a long series of cases, beginning with *First National Bank v. Langley*,314 So. 2d 324, 328 (Miss. 1975), and including *Sears, Roebuck & Co. v. Devers*, 405 So. 2d 989, 902 (Miss. 1981); *Entex, Inc. v. McGuire*, 414 So.2d 437, 444 (Miss. 1982); *Royal Oil Co. v. Wells*, 500 So.2d 439, 448 (Miss. 1986); *Blue Cross & Blue Shield, Inc. v. Maas*, 516 So.2d 495, 498 (Miss. 1987); *Singleton v. Stegall*, 580 So.2d 1242, 1247 (Miss. 1991); and most recently *Wirtz v. Switzer*, 586 So.2d 775, 784 (Miss. 1991); *see also McLoughlin v. O'Brian*, (1983) 1 A.C. 410. The upshot of these cases in the present rule

is a plaintiff may recover for emotional injury proximately resulting from negligent conduct, provided only that the injury was reasonably foreseeable by the defendant.

¶55. In *Universal Life Ins. Co. v. Veasley*, 610 So.2d 290 (Miss. 1992), we applied this rule to breach of contract cases stating:

> Some justices on this court have suggested that extra-contractual damages ought be awarded in cases involving a failure to pay on an insurance contract without an arguable reason even where the circumstances are not such that punitive damages are proper. [citations omitted]. Applying the familiar tort law principle that one is liable for the full measure of the reasonably foreseeable consequences of her actions, it is entirely foreseeable by an insurer that the failure to pay a valid claim through the negligence of its employees should cause some adverse result to the one entitled to payment. Some anxiety and emotional distress would ordinarily follow, especially in the area of life insurance where the loss of a loved one is exacerbated by the attendant financial effects of that loss. Additional inconvenience and expense, attorneys fees and the like should be expected in an effort to have the oversight corrected. It is no more than just that the injured party be compensated for these injuries.

*Veasley*, 610 So.2d at 295. The Court held that Veasley's testimony, which was apparently credited by the jury, was enough to support the award for emotional distress damages. *Id.*

¶56. Lawrence's proof for her claim for damages for mental anguish included her testimony at trial that she was "devastated" as a result of the denial of benefits and termination of employment. Lawrence stated that she was worried about where she would get the money to cover the basic household expenses. She also testified that she and her family lost their home as a result of the denial of benefits and termination of employment. The jury presumably gave credence to these claims and awarded Lawrence just compensation. Unless the reviewing court can say that no reasonable jury could have assessed the damages awarded based on the proof at trial, the award must be left undisturbed. *Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67, 75 (Miss. 1996) (*citing City of Jackson v. Locklar*, 431 So. 2d 475, 481 (Miss. 1983)). Moreover, when a jury returns a verdict in favor of the plaintiff, this Court resolves all conflicts in the evidence in the plaintiff's favor. *Id.* at 477. Based on the evidence presented to the jury at trial, it appears that a reasonable jury could have awarded damages in this case.

V.

**THE TESTIMONY OF DR. DAVID B. ROOS, AN EXPERT WITNESS FOR LAWRENCE, DID NOT GO BEYOND THE SCOPE OF LAWRENCE'S SUPPLEMENTAL INTERROGATORY ANSWERS, AND WAS PROPERLY ADMITTED**

¶57. Southwest contends that the lower court allowed Lawrence's expert witness to go beyond the scope of her supplemental interrogatory answers, violating Miss. R. Civ. P. 26(b)4, which states in pertinent part:

> (4) Trial Preparations: Experts. Discovery of facts known and opinions held by experts,

otherwise discoverable under subsection (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial , to state the subject matter on which the expert is expected to testify, and to state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion. . .

Specifically, Southwest alleges that the testimony of Dr. David B. Roos read into evidence at the trial went beyond the scope of the supplemented interrogatory answers Lawrence provided Southwest. The supplemental answers were filed by Lawrence on September 13, 1990. The deposition of Dr. Roos was taken via telephone on September 18, 1990.

¶58. The dispute arises over what Dr. Roos would testify to regarding Lawrence's injury and whether it was work-related or not. Dr. Roos' supplemented interrogatory answer reads, in pertinent part:

Dr. David B. Roos will testify as follows:

1. The thoracic outlet syndrome suffered by Mrs. Juedell T. Lawrence *could have been caused or aggravated by* her job-related activities. The fact that she is obese and strong-shouldered and predisposed to thoracic outlet syndrome does not negative its relationship to her employment activities. There is no other cause shown in the record that would account for thoracic outlet syndrome and the reported fall would have negligible effect. (emphasis added).

At trial, the deposition of Dr. Roos was read into evidence. The following transpired at trial:

Q. Now, let me also ask you to assume that Dr. Leon Parks has given the opinion to a medical probability, based on his treatment and the history she gave him, that Mrs. Lawrence's condition was caused or materially contributed to by her work-related activities. Based on that assumption and the records before you, do you have an opinion either way on that?

BY MR. BRUMFIELD [attorney for Southwest]: I object to this. It goes beyond the supplementation that is given that the Plaintiff gave on the date of September 13, 1990 as to what Dr. Roos would testify to. (Stopped reading deposition.)

BY MR. BRUMFIELD: And, your Honor, I don't know whether you wish me to present this outside the presence of the jury.

*****

(OFF THE RECORD DISCUSSION AT BENCH OUT OF THE HEARING OF THE COURT REPORTER)

BY THE COURT: All right. I'm going to let him testify. Overrule the objection.

(Continued reading the deposition.)

DIRECT EXAMINATION CONTINUED:

Q. You may answer the question.

A. Well, I don't know if Dr. Parks has more information than I do. He probably does, since he worked at that hospital and may have talked to her about the frequency and weight of the X-ray jackets. If that caused the strain of the shoulders, arms and hands, which is the condition we commonly associate with developing thoracic outlet syndrome from job-related activities, muscle strain through the neck, shoulders and arms.

*****

Q. Okay. Now turning to Paragraph 5. "The disability estimate of Dr. Parks is incorrect ." A summary of the grounds for his (Dr. Robert T. Sessions) opinion are as follows:

(A) You can't have a 30 percent disability and talk about going back to work like he (Dr. Leon Parks) did.

(B) Her disability does not exceed 12 percent on each arm.

Do you have an opinion in this area?

(Stopped Reading Deposition)

BY MR. BRUMFIELD: Now, Your Honor, I object to any opinion expressed on this question because it goes beyond the scope of the supplementation furnished. . .

(OFF THE RECORD DISCUSSION AT BENCH OUT OF HEARING OF THE COURT REPORTER AND JURY.)

BY THE COURT: I'm going to permit it.

BY MR. BRUMFIELD: Thank you.

(Continue Reading Deposition.)

Q. You may answer the question, Doctor.

A. Yes, I have an opinion.

Q. What is that opinion?

A. My opinion is that from the records of her later symptoms, I felt that she could not go back to employment, in agreement with Dr. Parks, requiring substantial filing, typing or repetitive use of the arms and hands. I would not necessarily put a percentage disability rating on that. I am not trained or very good at disability ratings, but I would feel 30 percent would be reasonable and that would prevent her in her persistent symptoms, plus her previous symptoms that we have mentioned several times here, prevent her going back to her previous job as a file clerk and typist.

Southwest contends that there was a big difference between what Dr. Roos stated in his deposition and the supplemental answers given in response to Southwest's interrogatories.

¶59. What Southwest fails to point out in the supplemental answers to the interrogatories is that later in the answers Dr. Roos does tie Lawrence's injuries to her work. The answer goes on to state:

> 4. While it may be true that Mrs. Lawrence also suffers from carpal tunnel syndrome and inflammatory disease of the shoulder, these conditions coexist with thoracic outlet syndrome in many cases and are interrelated with her job activities. The surgery performed by Dr. Parks corrected certain of Mrs. Lawrence's problems, specifically those related to thoracic outlet syndrome. She may have other problems coexisting with her thoracic outlet syndrome which are causing some of her residual effects, but these are likewise interrelated with her job activities.

> 5. Based on the record, I would agree with Dr. Parks that Mrs. Lawrence could not be expected to go back to an employment requiring substantial filing and/or typing activities.

¶60. Southwest's argument is based on semantics at best. They were aware that Dr. Roos was going to testify that there was a relationship between Lawrence's injuries and her work at the hospital. The language in the interrogatory and that used at trial was not vastly different, and if the interrogatories are read as a whole, then Southwest had sufficient notice of what the testimony of Dr. Roos would entail.

¶61. Furthermore, Southwest cites to the only authority in either brief, *Square D Co. v. Edwards*, 419 So. 2d 1327 (1982). In *Square D*, this Court held that a party must supplement interrogatories to reveal the identity of an expert witness, but must also supplement to reveal the substance of the testimony of such experts if not revealed in the original interrogatories. This Court stated that one of the principal reasons for interrogatories for pretrial discovery is to prevent "trial by ambush and surprise." *Id.* at 1329.

¶62. In the case *sub judice*, there was no surprise presented by the testimony read into evidence at the trial. We find no merit to this assignment of error.

## CONCLUSION

¶63. We affirm the award of actual compensatory damages in the amount of $66,000 to Lawrence. There was an agreement between the employee and the employer that workers' compensation benefits would be provided. We also affirm the decision of the lower court to allow Dr. Roos' testimony to be read into evidence and find that there was no violation of discovery rules in so allowing. Furthermore, we affirm the jury award of $18,144.43 to Mississippi Hospital Employee Benefit Trust and the award of $50,000 for mental anguish damages. We find that the lower court did not err in awarding attorneys' fees against Southwest in its Motion for Partial Summary Judgment.

¶64. We further find that the facts of this case did not support an award for punitive damages against Southwest. We thereby reverse as to the award of punitive damages. Alternatively, if the punitive damages were affirmed, the award should only be allowed to the extent of the insurance coverage in existence.

¶65. **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**LEE, C.J., PRATHER, P.J., AND PITTMAN, J., CONCUR. BANKS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND McRAE, J. McRAE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN, P.J., AND BANKS, J. MILLS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, J.**


### BANKS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶66. I concur with most of the majority holding but I must dissent to its treatment of the issue of punitive damages.

### I.

¶67. Southwest did not assign as error that the evidence presented at trial was insufficient to support an award of punitive damages. The only argument raised by Southwest as to the imposition of punitive damages is based on the doctrine of sovereign immunity. An issue is not ordinarily considered by this Court unless it has been raised. *Weems v. American Sec. Ins. Co.,* 486 So. 2d 1222 (Miss. 1986) (an appeal brings before the Court only that which is expressly assigned as error); *Brown v. Credit Center Inc.,* 444 So. 2d 358 (Miss. 1983) (neither party raised assignment of error on appeal resulting in waiver of objection by both parties). This is not the kind of issue which this Court should reach under the plain error doctrine. *Adams v. Green*, 474 So. 2d 577 (Miss. 1985) (Issue not taken up under the "plain error" doctrine because it was not assigned as error or properly briefed under our Rules).

### II.

¶68. In spite of Southwest's failure to raise an assignment of error, any challenge that suggests there was insufficient evidence to present the question of punitive damages to the jury is without merit. The trial court relied on *Reserve Life Ins. Co., v. McGee*, 444 So. 2d 803 (Miss. 1983) in determining that the question of punitive damages was for the jury to decide under proper instructions. If the trial court had found as a matter of law that Southwest had a legitimate or arguable reason for denying Lawrence's claim, this would have been error. However, the trial court remarked that ". . . [t]here does not appear to be one iota of investigation made as to the validity of the claim, and no opportunity to be heard, no due process given. Those things stated by Dr. Parks were uncontradicted by anyone, and yet the claim was denied." Southwest claims that a proper unbiased investigation was conducted and that Lawrence's claim was denied pursuant to the findings of this inquiry. Thus, a jury question was presented on the issue of punitive damages because a dispute of fact existed as to whether a reasonable investigation of the claim was conducted. *National Life and Accident Ins. Co. v. Miller*, 484 So. 2d 329 (Miss. 1985) (The issue of punitive damages was properly submitted to the jury when insurer conducted an inexcusable inadequate investigation); *Bankers Life & Cas. Co. v. Crenshaw*, 483 So. 2d 254 (Miss. 1985) (Punitive damages appropriate where insurer grossly

violated its own in-house procedures for investigating a claim); *Florence v. Equity National Life Ins. Co.*, 637 So. 2d 183 (Miss. 1994) (Punitive damages instruction proper where denial of claim made without appropriate investigation).

**SULLIVAN, P.J., AND McRAE, J., JOIN THIS OPINION.**

**McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶69. I agree with the majority opinion except with regard to its determination that the facts of the case do not warrant imposition of punitive damages against Southwest, and its reversal of that award.

¶70. Southwest has not challenged the merits of the punitive damages award either in its brief or its reply brief. Rather, the entire sum and substance of the appellant's argument on this point is whether Southwest, a community hospital, *is subject to* the imposition of punitive damages against it or whether it is protected by sovereign immunity. Indeed, in Section III of its opinion, following our decision fifteen years ago in *Anthony v. Frith,* 394 So. 2d 867, 868 (Miss. 1981), the majority finds that Southwest is liable for punitive damages to the extent provided for in its liability insurance policy. Nevertheless, without any reason for its finding or any citation of authority, the majority simply concludes that the award of punitive damages was unsupported by the facts of the case, stating:

> In the case at bar, however, we do not believe the facts support a punitive damages award against Southwest. For that reason, we reverse the award of punitive damages. Alternatively, were punitive damages affirmed, the award should only be allowed to the extent of the insurance coverage in existence.

(Slip op. at 22; *see also,* Slip op. at 2).

¶71. Even if the merits of the award were properly before this Court, we would have to find that yes, the evidence does support an award for punitive damages. In our analysis of extra-contractual damages, we have drawn a line between damages for emotional distress, which the majority did affirm, and punitive damages, often recognizing that compensation for emotional distress -- "devastation," anxiety, insomnia, etc. -- may be warranted even when an award for punitive damages is not. *Universal Life Insurance Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992). An award of punitive damages in a breach of contract case requires that the breach be accompanied by an intentional wrong, insult, abuse or such gross negligence as to rise to the level of an independent tort. *Peoples Bank and Trust Co. v. Cermack,* 658 So. 2d 1352, 1361 (Miss. 1995); *Strickland v. Rossini*, 589 So. 2d 1268, 1273 (Miss. 1991). In this case, Southwest's refusal to pay workers' compensation through its self-insurance plan contrary to the benefits outlined in the Employee Handbook and its termination of Lawrence's employment in response to her request for benefits could certainly be interpreted by a reasonable jury as amounting to an independent intentional tort.

¶72. In *Willard v. Paracelsus Health Care Corp.*, Nos. 92-CA-00996-SCT, 92-CA-01274-SCT, 93-CA-00021-SCT (Sept. 12, 1996), this Court unanimously found that where two employees of a community hospital were discharged contrary to terms of the employee handbook and policy and procedures manual, in addition to a punitive damages instruction on the former employees' charges of

retaliatory discharge, the jury further should have been instructed on damages for tortious breach of contract:

> It is possible that a reasonable jury could find an intentional wrong here necessitating the imposition of punitive damages. The trial courts may consider submitting a punitive instruction to the jury on this basis as well.

*Willard*, Slip op. at 11. As in Mrs. Lawrence's case, employees of a community hospital were treated contrary to provisions of the employee handbook. The facts in the case *sub judice* are no less egregious than those in *Willard.* Accordingly, the majority errs in concluding, almost as an afterthought and without discussion or citation of authority, that the award of punitive damages to Lawrence was unwarranted and should be reversed. Therefore, I disagree with that part of the majority opinion.

**SULLIVAN, P.J., AND BANKS, J., JOIN THIS OPINION.**

**MILLS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶73. I concur with the majority opinion except as to the language in Issue III, holding that punitive damages may be assessed against governmental entities.

¶74. It is my view that punitive damages should not be allowed against governmental entities until such time as the Legislature authorizes such relief by statute.

**SMITH, J., JOINS THIS OPINION.**

1. Mrs. Welch-Kinnerman was laid off in May of 1985 for economic reasons.

2. Lawrence suffers from a myriad of health problems, in addition to the problems at issue in the case *sub judice*. These health problems include bleeding ulcers, Stein-Levanthal syndrome (enlarged ovaries caused by too much male hormone), lower back problems, heel spurs, ankle and knee problems, a seizure disorder, acute cystitis, and gross obesity.

3. Lawrence's husband has been totally disabled since August, 1978 and does not work.

4. Lawrence's attorney listed 12.25 hours work on this matter, plus $165 additional out-of-pocket expenses. Attorney Neville stated that his usual hourly fee was $75 an hour for non-litigation matters, and $90 an hour for court litigation. The total attorney's fees stated in Neville's affidavit was $1,083.75. The lower court awarded $750 in attorney's fees.

5. In a letter dated April 24, 1987, Virginia Insurance Reciprocal sent the following to Mr. Brumfield, attorney for Southwest:

> . . . As we discussed, after careful review of the complaint and our policy, it is apparent that our coverage would not apply to this loss. Our policy excludes claims brought as a result of offenses, either directly or indirectly, related to employment of such person. . .

6. Specifically, the Fifth Circuit cited *Presley v. Mississippi State Highway Comm'n*, 608 So. 2d

1288 (Miss. 1992), in which this Court declared the Mississippi Sovereign Immunity Act, Miss. Code Ann. §§ 11-46-1, *et seq.*, unconstitutional. *Lawrence* found that since this case arose under a different statute, § 46-13-11, any alterations to § 11-46-1 had no effect. *Lawrence*, 979 F.2d at 1056 n. 5.

7. **Lawrence** states that "[b]ecause they [punitive damages] do not fall within this category, Southwest lacked the statutory authority to purchase insurance to cover them. [footnote omitted]. In other words, the legislature did not expressly waive the hospital's sovereign immunity in this respect." **Id.** at 1057. However, the case cited in support of that last statement is **Joseph v. Tennessee Partners, Inc.,** 501 So. 2d 371, 375 (Miss. 1987), which was expressly overruled by **Churchill v. Pearl River Basin Dev. Dist.,** 619 So.2d 900 (Miss. 1993).

8. Dr. Parks based his opinion on his experience with working with workers' compensation cases. He stated that "it has been established through the years that an individual is entitled to 15% disability of the body as a whole,. . ., for one thoracic outlet syndrome problem."

9. It should be noted that subsequent to Lawrence's surgeries for thoracic outlet syndrome and prior to the trial, Lawrence had a baby in June 1989, her third child. Dr. Parks testified that the fact that she was carrying the baby around with her left arm was an indication that she did get relief from the operation on the left side.

10. Dr. Roos developed a procedure in 1964 for removing the top first rib from the rib cage to give relief to patients suffering from thoracic outlet syndrome. The procedure is known as the Roos procedure.