# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2003-CA-00190-SCT

*UNIVERSITY OF SOUTHERN MISSISSIPPI; DR.*
*DAVID HUFFMAN, DR. GLENN HARPER, AND DR.*
*REX STAMPER*

*v.*

*DAVIDA DAWN WILLIAMS*

| | |
|---|---|
| DATE OF JUDGMENT: | 7/30/2002 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ALAN M. PURDIE |
| | LEE PARTEE GORE |
| | RICKY L. BOGGAN |
| ATTORNEY FOR APPELLEE: | KIM T. CHAZE |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 11/10/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     On July 16, 1996, Davida Dawn Williams, a doctoral student at the University of Southern Mississippi (USM), filed suit in the Forrest County Circuit Court against USM, as well as USM professors Dr. David Huffman, Dr. Glenn Harper, Dr. Harry McCraw, and Dr. Rex Stamper, in their individual and official capacities. She sought actual damages in the sum of $10 million, punitive damages in the sum of $10 million, relief under 42 U.S.C. §§ 1983 et

seq. and unspecified injunctive relief under the Mississippi Rules of Civil Procedure and statutes. Her complaint alleged that the defendants jointly and severally engaged in a wrongful and malevolent course of conduct which prevented her from receiving her doctoral degree and caused severe emotional and mental anguish. In addition, she alleged general deprivation of unspecified property interests and contractual and constitutional rights. Six years later, in July 2002, after lengthy delays, nominal activity in the case, continuances, and resettings of trial dates, the case was tried before a jury which returned an 11-1 general verdict for Williams, in the sum of $800,000 "actual damages." The trial court entered judgment in accordance with the verdict. Following denial of the defendants' motions for remittitur, JNOV, and alternatively for a new trial, USM and three of the four professors[1] timely perfected their appeal. They raise twelve issues which encompass incorrect and unwarranted jury instructions; failure to apply the Mississippi Tort Claims Act; incorrect application of 42 U.S.C. § 1983; erroneous denial by the trial court of their motions for directed verdict, new trial, JNOV or remittitur; judgment against the great weight of the evidence; and no legal basis for the judgment.

¶2.    After careful review of the record before us, we conclude that the trial court should have granted the defendants' motion for JNOV on the § 1983 claim and the Mississippi Tort Claims Act claim. We affirm, however, the trial court's denial of the defendants' motion for JNOV on Williams's contract claim. We reverse the judgment entered against the defendants, and we remand to the trial court for a new trial solely as to damages on Williams's breach of contract claim.

---

[1] Dr. Harry McCraw died soon after the suit was filed, and prior to trial, his estate was dismissed.

2

**FACTS**

¶3.     The facts in this case cover a period of seventeen years, and the following time line is provided to assist in understanding the sequence of events relevant to Williams's claims:

| | |
|---|---|
| Summer 1985 | enrolled at USM to pursue Ph.D. degree in English |
| Fall 1985 | passed doctoral qualifying examination |
| | completed 10 hours, made three A's and one B |
| Spring & Summer 1986 | completed 19 hours, made all A's |
| August 6, 1986 | passed graduate school foreign language test |
| Fall 1986 | completed seven hours, made all A's |
| | dissertation committee selected[2] |
| Spring 1987 | completed three hours, made an A |
| | passed doctoral comprehensive exam (now ABD[3]) |
| | admitted to candidacy for Ph.D., enrolled Eng. 898 |
| Fall 1987 | Eng 898[4] (independent study on dissertation) |

---

[2]  Dr. Rex Stamper was the committee chair and is from time to time in the record referred to as chair, major professor, or dissertation director.  Members of the initial committee were Drs. David Wheeler, Harry McCraw, Thomas Richardson, and Kenneth Watson.  There was testimony from Dr. Wheeler that there may be two committees involved in the doctoral process, the exam committee to evaluate the exam and a different dissertation committee.  He then went on to say that Williams had a doctoral committee, and whether this was her dissertation committee or not, he didn't know.  There is no reference in the record to indicate a different "exam committee", and it appears that the terms "doctoral committee" and "dissertation committee" are used interchangeably.  There apparently was an initial dissertation committee as stated immediately above, and at some time after the September 1990 meeting at which Williams voiced her complaints and asked for a new chair of the committee, Dr. Anne Wallace was added, and Dr. McCraw was named the new chair or director.  Dr. Will Lyddon, who was requested by Williams, was never added, and the second rejection of the dissertation was approved by Drs. McCraw, Wallace and Watson only.

Drs. Richardson and Wallace were the only two witnesses called to testify on behalf of USM and the professors.  Both of them denied being on Williams's dissertation committee, although contradictory evidence is also found in the record.

[3]  ABD (All But Dissertation) is a common designation used for doctoral students who have completed all requirements but the completion and defense of their dissertation.

[4]  According to testimony by Dr. Wheeler, infra, the designation Eng 898 appears on the transcript of a student who is "actively working on a dissertation."  It appears on Williams's transcript only in the spring and fall of 1987.  There is no testimony which indicates that the absence of such transcript designation means or implies that a student is not working on the dissertation.  There were tuition costs involved when the enrollment designation was shown, and none thereafter.

|  |  |
|---|---|
|  | instructed in English department - USM |
| 1988 | dissertation in progress (not shown on transcript) |
|  | instructed in English department - USM |
|  | instructed in criminal justice department - USM |
| February 1989 | received inappropriate Valentine card from Stamper |
| Spring & Summer 1989 | dissertation in progress (not shown on transcript) |
|  | instructed in criminal justice department - USM |
| March 3, 1989 | prospectus for dissertation approved by committee |
| August 31, 1989 | dissertation still in progress (not shown on transcript) |
| Fall 1989 | instructed in criminal justice, Pearl River Community College (PRCC) |
| June 21, 1990 | Stamper's memo to Williams indicating valid dissertation premise but underdeveloped concept, some suggestions, requesting to see it before proceeding |
| Aug. or Sept. 1990 | Stamper's visit to Williams's home to discuss dissertation revisions/attempted sexual assault[5] |
| Sept. 1990 | meeting with Dr. Harper, Dean of the College of Liberal Arts and Dr. Wheeler, Chair of the English Department, to report Stamper's conduct and request his removal |
| Spring & Fall 1990 | instructed in criminal justice and English, PRCC |
| Spring 1991 | instructed in criminal justice and English, PRCC |
|  | still trying to meet with Dr. McCraw, new director of her dissertation committee appointed by Dr. Wheeler |

---

[5]  Williams's account of the assault was that Stamper just appeared at her door, and she was stunned. He had her dissertation in his hand and said that he had read it that weekend. As she put it, "I didn't say anything because now I'm like totally distrustful. And he just came on in. I didn't invite him and he just came on through the door. He's aggressive in that way." She said she was upset and scared but confronted him with what she had been told by Jessie Stevens, a staff person in the English department: "'[A]fter you promising me that you are, after three years now, that you're going to get me defended this semester, she just told me you're not even going to be on campus, that you're taking sabbatical leave.' And he just laughed and said, 'well don't worry about it; we'll have plenty of time; we'll have lots of fun.' And at that time he pushed me...backwards on top of the glass table...and he was on top of me and running his hands all over me, my private parts, and he seemed to be enjoying it immensely, and he said . . .'[d]on't worry about your doctorate . . . because when I sign off on your dissertation, the rest of the committee members will do what I tell them.'" Williams explained that she was able to get away from Stamper: "I was hysterical, and I was screaming at the top of my lungs, get out of here, get out of here, and he left." He also implied "no sex, no dissertation, no Ph.D.," according to Williams.

Stamper admitted going to Williams's home, but testified that "her recollection of that event and my recollection are totally separate." He acknowledged that he had gone to her home some 25 to 30 times over a six-year period and admitted that he remembered having sexual intercourse with her in her home on four occasions "between 1985 through 1986. I had no relations with her from '87, '88 and further."

| | |
|---|---|
| April 17, 1991 | head of USM's criminal justice program humiliated Williams at annual awards program by calling her to stage to thank her, then making improper remark with sexual overtones about her before roughly 200 people |
| May 13, 1991 | letter to Dean Harper to report incident, continued harassment, Stamper still making unwanted calls to her |
| Summer & Fall 1991 | instructed in English, PRCC |
| | renewed request to Dr. McCraw for advice and direction as to how to proceed with dissertation |
| February 1992 | married and moved to Gautier, MS |
| Spring 1992 | instructed in English, PRCC |
| March & September, 1992 | letters to Dr. McCraw, still awaiting response |
| January 1993 | another letter to Dr. McCraw requesting a meeting with him to discuss dissertation |
| December 1993 | yet another letter to Dr. McCraw asking to meet with him, pointing out she's been ABD since 1987, must see him and determine the future course of dissertation |
| November 1994 | talked separately with Dr. Wheeler and Dr. McCraw, gave McCraw revised dissertation, and was told Dr. Richardson would have to be replaced; plans made to defend, finish all work, and get degree by December 1995; no further communication for 6 months |
| June 5, 1995 | received letter from Dr. McCraw noting dissertation not a viable project and she needed to start over; included was a letter from Dr. Wallace, appointed to the dissertation committee without Williams's knowledge or approval, corroborating McCraw's evaluation |
| December, 1995 | letter to Dean Harper saying the sexual harassment and discrimination still continue, asking for help; Williams's attorney's letter to Dr. Ginn, Vice President of Administrative Affairs, denoted as grievance notice outlining eleven specific complaints |
| January 8, 1996 | letter from Mary Villeponteaux, graduate director, offering sympathy but no specific help with complaints |
| February 15, 1996 | meeting between Williams, her attorney, Dr. Huffman, and USM's attorney to discuss problems and solutions connected; Huffman to get back in touch, but did not |
| April 23, 1996 | letter to USM attorney requesting status report; no response |
| July 15, 1996 | filed suit in Forrest County Circuit Court |
| July 30, 2002 | Final Judgment |

¶4. The Ph.D. degree in English program in which Williams enrolled requires a qualifying examination after one full semester's work; proficiency in two foreign languages; a minimum of 48 semester hours beyond the master's degree; a written comprehensive examination; and presentation and defense of a dissertation, according to the graduate bulletin under which she enrolled. The portion of the bulletin included in the record is silent about procedures to be followed when problems involving the completion and defense of a dissertation arise. By the end of 1987, Williams had finished her course work with a 3.92 grade point average, and she had passed her comprehensive exams and proficiency tests in two foreign languages. Positive and encouraging remarks about that progress are in the record. Subsequently, her dissertation committee approved a detailed prospectus, which cleared Williams to proceed with research and writing of her dissertation. Upon successful defense of the dissertation, she would receive her Ph.D. degree.

¶5. According to the graduate bulletin, a student's presentation and defense of a dissertation is supervised by a departmental committee composed of a chairman and four members recommended by the department chairman and appointed by the graduate dean. Williams was allowed to request and approve who would serve as members of her committee, including Stamper as the chair of the committee and director of her dissertation.

¶6. The primary focus of the present case is Stamper's conduct as a professor and as the chair of Williams's doctoral committee. The secondary focus is the general lack of attention and seriousness shown by a number of USM professors and officials to Williams's reports of improper and unwarranted sexual misconduct. Williams testified that Stamper's conduct as a faculty member towards her between 1985 and 1987 was "flirty" but not "harmful."

6

However, after Stamper had become chair of her dissertation committee, that began to change. Williams testified at trial that Stamper's conduct became "sexual harassment," which included, among other things: office visits which often turned sexual in nature; telephone calls to her home; a lewd and vulgar Valentine card placed by Stamper into Williams's university mailbox in February 1989; and eventually, in 1990, the sexual assault.

¶7. Stamper acknowledged in his testimony that he went to Williams's home between twenty-five and thirty times for reasons related to his academic duties and his chairmanship of Williams's dissertation. In addition to these trips to Williams's home, Stamper also conceded and admitted that he visited in the homes of between 100 and 200 students, male and female, during his 20 year tenure at USM. Stamper also testified that he and Williams had engaged in consensual sexual relations, which Williams denied.

¶8. For several years before the assault, Williams had complained occasionally and generally about Stamper's inappropriate behavior to his immediate bosses, Dr. Thomas Richardson, Chair of the English Department from 1985-1988, and his successor, Dr. David Wheeler, Chair from 1988 forward. After the assault, however, she set up a special meeting with Dr. Glenn Harper, Dean of the Liberal Arts College, and English chair Wheeler to lodge her complaints. According to Williams's testimony, she told them in detail about what had happened in her home with Stamper and what she had endured for the past several years by him. Dean Harper, however, testified that she did not tell them about the alleged assault, but made general allegations of inappropriate behavior, and only wanted Stamper removed as chair of her doctoral committee. The result of the meeting, according to Williams, was that Harper and Wheeler agreed to remove Stamper from the dissertation committee, name McCraw as

7

chairman, order Stamper to stay away from Williams, and add Dr. William Lyddon from the Psychology Department to the committee. At trial, however, Stamper testified that he was not removed from the committee and was never told to stay away from Williams. Furthermore, Lyddon testified that he was never contacted about joining Williams's dissertation committee and was never shown a copy of Williams's dissertation.

¶9. Williams testified that, despite her complaint to Harper and Wheeler, the sexual harassment continued. According to Williams, Stamper and another now former USM professor harassed her until 1992, when she remarried. Williams further testified that, during this time, she could not get advice that she sorely needed in order to proceed with her dissertation. She wrote McCraw, her new dissertation chair, seven times between April 5, 1991, and November 29, 1994, and called him numerous times. As shown by the record, her written messages were pleasant, positive and deferential to the heavy demands which Dr. McCraw must have had with his classes, etc. They also clearly and courteously expressed her concern about needing guidance regarding her dissertation. Finally, on June 5, 1995, more than four years after he was appointed as chair, McCraw replied:

> First of all, let me apologize for the unconscionable lateness of this letter. . . . I got distracted and I failed to reply . . . .I am sorry if I have caused you any inconvenience . . . .
> The consensus of those of us who would form your graduate committee here at USM (Dr. Anne Wallace, Dr. Ken Watson and myself) . . . is that this is not a viable project as it now stands. The particulars are spelled out in the accompanying letter from Dr. Wallace. . . .
> Our opinion is that **if you wish to pursue a doctorate in English at USM, this could best be done by working with us from the start** on a project which would be fully supported by contemporary criticism and critical methodologies. . . .

(emphasis added.)

8

¶10. After reading McCraw's letter, Williams hired an attorney. On February 15, 1996, Williams, her attorney, Vice President of Academic Affairs Dr. David Huffman, and USM's attorney met to discuss Williams's claim. When she did not hear from the university for another five months, Williams filed suit on July 15, 1996.

¶11. When the case went to trial in July, 2002, much of the testimony and evidence supporting Williams was admitted into the record without objection. During the six-day trial, Williams herself testified at length. She was an articulate witness and described her academic background which included an undergraduate degree in English (with special distinction) and master's degree in English from Arkansas State University, as well as further certification as a specialist in community college teaching, also from ASU. She also described her career prior to enrollment at USM, including two years as a teacher and two years as an FBI special agent (from which she resigned when she married, came to Mississippi, and embarked on the pursuit of her Ph.D. in English).

¶12. She also called as witnesses Leland Ray, another graduate student; Dr. Darlys Alford, a psychology professor and personal friend; Dr. David Wheeler; her son, Heath Williams; Dr. Will Lyddon, psychology professor who Williams requested be appointed to her doctoral committee; Dr. Norman Stafford, professor of English at Arkansas State University; and David Greenwell, Williams's husband. Defendants Stamper, Harper, and Huffman were called, adversely, by Williams. USM and the professors offered little testimony in defense, calling only Drs. Thomas Richardson and Anne Wallace (English Department faculty members) to testify.

## ANALYSIS

9

¶13. We note at the outset that the decision of this Court reached in this case is very fact specific and thus narrowly written and should not be construed as giving approval to the application of contract theory to circumvent the protection afforded our universities and the employees thereof by the Mississippi Tort Claims Act.

¶14. This Court reviews a circuit court's decision to deny a JNOV motion de novo — that is, this Court does not defer to the circuit court's decision but rather reviews the matter anew. *Northern Elec. Co. v. Phillips*, 660 So.2d 1278, 1281 (Miss. 1995). A circuit court should only deny a JNOV motion as to a particular theory of liability where the particular theory of liability is legally sufficient to support the verdict. Miss. R. Civ. P. 50.

## I.    Denial of JNOV re: Williams's 42 U.S.C. § 1983 claim

¶15. Section 1983 creates a cause of action against any person who, acting under color of state law, abridges rights created by the Constitution and laws of the United States. Specifically, the statute provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. Section 1983 is not itself a source of substantive rights, but rather a remedy for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes. *Wilson v. Garcia*, 471 U.S. 261, 278, 105 S.Ct. 1938, 1948, 85 L.Ed.2d 254 (1985). However, based upon established principles of statutory construction and common law immunities, the United States Supreme Court has held that neither states nor state officials acting in their official capacities are "persons" within the

10

meaning of § 1983. ***Will v. Mich. Dep't of State Police***, 491 U.S. 58, 64, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989). In ***Will***, the United States Supreme Court said: "Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." 491 U.S. at 66, 109 S.Ct. at 2309. Furthermore, according to ***Will***, Congress did not intend to create a cause of action through § 1983 against States to be brought in state courts. ***Id.***

¶16. USM moved for judgment notwithstanding the verdict as to Williams's 42 U.S.C. § 1983 claim. Though Williams claims in her brief before this Court that she did not seek relief under §1983, she specifically pled a § 1983 cause of action among others in her Complaint initiating this lawsuit. Williams appeared to abandon all § 1983 claims during the course of the trial, and the trial court refused, without explanation, the defendants' requested jury instruction D-5 which stated that, as a matter of law, USM and the professors in their official capacity, are not persons under 42 U.S.C. § 1983. Nevertheless, the trial court denied USM's motion for JNOV regarding any claim Williams had based upon § 1983. It is uncontested by the parties that USM is an agency of the State of Mississippi and therefore is immune from suit in state courts unless the State waives its sovereign immunity or Congress overrides state sovereign immunity through Section 5 of the Fourteenth Amendment. ***Id.*** at 66, 109 S. Ct. at 2309-10; Miss. Code Ann. § 11-46-5. Williams initially named as defendants USM, along with professors Huffman, Harper, McCraw, and Stamper in their individual and official capacities. Subsequently, Williams voluntarily and inexplicably dismissed Stamper in his individual capacity and also dismissed McCraw's estate following his death. The circuit court,

11

on motion for directed verdict at the conclusion of Williams's case-in-chief, dismissed Harper and Huffman in their individual capacities.

¶17. Thus, when the jury returned its verdict, there were no individual defendants left; only USM and the three professors in their official capacities remained. Accordingly, any § 1983 claims by Williams should have been dismissed as a matter of law, and the circuit court erred when it denied USM's motion for judgment notwithstanding the verdict regarding Williams's 42 U.S.C. § 1983 claim.

## II. Denial of JNOV re: Williams's contract claim

¶18. In her complaint, Williams stated that as a doctoral student, she had "significant contractual rights" and that the course of conduct of the defendants deprived her of those rights. She claimed an implicit and explicit contract whereby she paid a significant amount of money to USM in return for the opportunity to pursue her academic endeavors in an unfettered academic environment, free from harassment. Although Williams asked for $10 million in actual damages, $10 million in punitive damages, as well as all relief to which she is entitled under § 1983, and for injunctive relief under unspecified statutes and rules of civil procedure, she did not request specific performance or any other identifiable contractual relief other than the omnibus request for "such relief which is just, legal, and equitable."

¶19. Williams primarily relied on *Univ. of Miss. Med. Ctr. v. Hughes*, 765 So. 2d 528 (Miss. 2000). In *Hughes*, several medical students sued the medical school for injunctive relief when the university changed its degree requirements after the students had enrolled. *Id.* at 531. This Court held, after examining numerous federal and other state authorities, that "the student-university relationship is contractual in nature and that the terms of the contract may

be derived from a student handbook, catalog, or other statement of university policy." *Id.* at 534.

¶20. Williams argues, in essence, that USM breached the contract created by USM's graduate catalog, by not providing her the educational opportunity for which she paid, by not giving her a fair hearing regarding her complaints about actions and inactions of the professors, and by not acting with "good faith" and "fair dealing." USM vigorously contests Williams's interpretation of *Hughes*, arguing that the holding in *Hughes* is limited and that Williams did not prove USM violated any term of an alleged "contract."

¶21. Until *Hughes*, there was a dearth of Mississippi case law defining the relationship between the university and the student. In formulating the holding in *Hughes*, this Court examined carefully the law of numerous other jurisdictions and how they addressed the rights and responsibilities in the student/university relationship. *Id.* This Court agreed with sister jurisdictions that the student/university relationship is "contractual in nature," but also held that "rigid importation of the contractual doctrine has been rejected." *Id.*

¶22. Of particular concern to this Court, as well as others across the nation, is the potential danger of judicial intervention in the academic context and that such intervention "would interfere unnecessarily in the [u]niversity's discretion to manage its academic affairs." *Id.* at 535. However, this Court's reluctance to intervene in the academic context does not mean that academic decisions are inherently unreviewable. While this Court respects the academic process and the necessarily deferential standard by which we review academic decisions, such deference should not be construed as a license for administrators to act arbitrarily and

13

capriciously when making decisions that affect a student's academic standing, nor to act in bad faith or deal unfairly with a student.

¶23.    As in *Hughes,* the present case is one of first impression, involving a doctoral candidate's pursuit of the Ph.D. degree and the unique dissertation committee/defense process utilized in doctoral programs in universities nationwide.   So we looked to other jurisdictions for insight into how they have applied the contractual duty of good faith and fair dealing to the conduct of a university in its relationship with Ph.D. students.   We found no doctoral cases on point, but one involving a master's degree program is instructive.   In *Olsson v. Bd. of Higher Educ.*, 402 N.E.2d 1150, 1153 (N.Y. 1980), a master's degree candidate with an "honors average" at the John Jay College of Criminal Justice argued that the college should be estopped from asserting that the student had not fulfilled the requirements for graduation because the student's deficiency was caused in part by reliance upon a professor's misleading statement regarding the institution's grading criteria.   To obtain a master's degree from the college, Olsson had to pass a final "comprehensive" examination on the field of criminal justice. Relying on a professor's misstatements as to the criteria for passing the exam, Olsson and several other students took the five question exam believing that they only had to score three points out of a possible five on three questions.   In reality, the students had to score three points on four of the questions to pass the examination.   Olsson petitioned the academic appeals committee to award him his degree based upon the grading standard the professor represented.    The committee refused to do so, but in the interest of fairness it offered to expunge the results of Olsson's examination and permit Olsson to take the exam again without prejudice.    Finding this offer unacceptable, Olsson instituted legal action to compel the

14

college to award him a diploma based upon his existing examination score. While the New York trial and intermediate appellate courts found for Olsson, the Court of Appeals (New York's highest court) reversed, holding that estoppel was an extreme remedy to be used only in the most egregious of circumstances. The Court of Appeals held that Olsson had a less drastic remedy by being able to retake the test without prejudice. While the Court of Appeals expressed and exercised caution in intervening in academic affairs, the court did state that intervention is warranted when an educational institution does not act in good faith in its dealing with students, but instead exercises discretion in an arbitrary or irrational fashion. *Id.* at 1153. In the present case, the remedy offered by USM arguably is extreme: that she start all over, after 8 years of working directly on the dissertation, when she was unable to get the guidance from those whose responsibility it was to advise and direct her work.[6]

¶24. This Court has consistently recognized that every contract contains an implied covenant of good faith and fair dealing in performance and enforcement. *Morris v. Macione*, 546 So.2d 969, 971 (Miss. 1989). "Good faith is the faithfulness of an agreed purpose between two parties, a purpose which is consistent with justified expectations of the other party. The breach of good faith is bad faith characterized by some conduct which violates standards of decency, fairness, or reasonableness." *Cenac v. Murry*, 609 So.2d 1257, 1272 (Miss. 1992). Bad faith, in turn, requires a showing of more than bad judgment or negligence; rather, "bad faith" implies

---

[6] The record does not reflect that the unspecified injunctive relief pled by Williams would include that her current dissertation be approved, or even that she is asking to continue in the USM doctoral program. She primarily seeks monetary damages for the harm which has been done.

15

some conscious wrongdoing "because of dishonest purpose or moral obliquity." ***Bailey v. Bailey***, 724 So.2d 335, 338 (Miss. 1998).

¶25.   In the present case, there is no way to know the basis for the jury's verdict which awarded Williams "$800,000 in actual damages."[7]   The very nature of a general verdict precludes that knowledge.   Because this issue is before us on JNOV, our review is de novo, and based upon the record before us, there is sufficient evidence from which reasonable jurors could conclude that USM and its employees breached the duty of good faith and fair dealing in their relationship with Williams.   Although we are mindful that directly conflicting testimony was given, the documentary evidence is clearly supportive of many of Williams's allegations.

¶26.   When a student enrolls in a doctoral program, the university is justified in expecting the student will satisfactorily complete all the requirements of the program.   There is evidence that

---

[7] Jury Instruction P-10 provided the elements of damages, as follows:

In fixing compensatory damages you should determine the amount of money which will, in your judgment, reasonably and fairly compensate DAVIDA WILLIAMS for any harm of any kind which was proximately caused by the wrongful conduct of the Defendants. Among the elements of injury and harm for which compensation may be awarded are:
   A.   Emotional harm, if any, to DAVIDA WILLIAMS during and after the damages received, including emotional distress, humiliation, personal indignity, embarrassment, fear, anxiety, and/or anguish which DAVIDA WILLIAMS suffered;
   B.   Money lost;
   C.   contractual losses, if any, that she should be awarded, and this award should place her in as good a position as she would have been if she had not been subjected to the breach of contract.

No objection to this instruction was made by counsel for the defendants.

USM and its employees knowingly conducted themselves in ways which violated standards of decency, fairness, and reasonableness.

¶27. As mentioned previously, it is uncontested that Williams maintained close to a 4.0 grade point average in her doctoral course work, demonstrated proficiency in two foreign languages, passed her comprehensive exams, and obtained approval of her detailed prospectus. In addition to her success in the doctoral program, Williams was also entrusted by USM with teaching responsibilities. In short, she was a mature, accomplished student on the verge of full acceptance into academia. The jury apparently believed, however, that the actions and inactions of Stamper and other USM officials precluded, or at least severely delayed, Williams's ability to complete the final requirement of a doctorate: the presentation and defense of an acceptable dissertation.

¶28. Williams claims that Stamper prevented her from defending her doctoral dissertation because she refused to engage in sexual relations and rebuffed his sexual advances, which he denies. Huffman, USM's vice-president for academic affairs, testified that based upon USM's graduate bulletin, Williams had the right to a "fair committee that made non-arbitrary decisions." Stamper claims that his refusal to allow Williams to defend her dissertation was based upon deficiencies in the dissertation itself. Assuming, arguendo, that is correct, the jury was still free to judge the credibility of the witnesses and consider what impact his other actions, and those of other USM professors and/or officials, might have had upon her efforts and ability to present a dissertation deemed worthy of defense. Stamper testified that he visited Williams's house between twenty-five and thirty times and had consensual sex with her on multiple occasions. He professed he was unaware of any university policy that precluded

17

a professor from being involved in a sexual relationship with his student. In addition, USM did not contest the admission into evidence of the lewd Valentine which Stamper personally delivered to Williams's university mailbox. There was also testimony by a fellow professor that Stamper had a reputation as a ladies' man.

¶29. As proof that other USM professors engaged in conscious wrongdoing, frustrating Williams's attempts to prepare and defend her dissertation, Williams testified that in September, 1990, she complained to Dean Harper and English Department Chair Wheeler about Stamper's sexual harassment and threats. Williams further testified that as a result of her complaint, they agreed to remove Stamper from the dissertation committee, prevent Stamper from having contact with her, install McCraw as dissertation chair, and add Dr. Lyddon to the committee. There is no documentary evidence in the record to show what, if anything, was actually done by USM to fulfill such an agreement. According to the testimony of Williams, Stamper did not cease his harassment. In addition, Stamper himself testified that he was never notified of any removal from Williams's committee nor told to stay away from her. Furthermore, Lyddon testified that he was never contacted by a USM official about serving on Williams's committee and had never seen a copy of her dissertation. Finally, after Williams made many attempts to correspond through mail or telephone with McCraw between spring 1991 and June, 1995, McCraw responded by apologizing for his "unconscionable" lack of response. McCraw then went on to inform Williams that her dissertation committee (professors Wallace, Watson and himself) did not believe her dissertation was presently viable and that she would need to work with them "from the start on a [new] project."

¶30. This Court traditionally has held that emotional distress and mental anguish damages are not recoverable in a breach of contract case in the absence of a finding of a separate independent intentional tort. *Life & Cas. Ins. Co. v. Bristow*, 529 So.2d 620, 624 (Miss. 1988). In recent years, however, this Court has moved away from this requirement. See *Southwest Miss. Reg'l Med. Ctr. v. Lawrence*, 684 So.2d 1257, 1269 (Miss. 1996). It is now undisputed that under Mississippi law a plaintiff can assert a claim for mental anguish and emotional distress in a breach of contract action. However, our decisions over the past several years addressing mental anguish and emotional distress are arguably unclear. On the one hand, we have held that we require a heavy burden of proof in order to establish a right to recover emotional distress damages. *Wilson v. Gen. Motors Acceptance Corp.*, 2003-CA-00233-SCT, 2004 WL 1688355, at *6 (Miss. July 29, 2004). On the other hand, we have allowed recovery for mental anguish based upon the following testimony:

> Lawrence's proof for her claim for damages for mental anguish included her testimony at trial that she was 'devastated' as a result of the denial of benefits and termination of employment. Lawrence stated that she was worried about where she would get the money to cover the basic household expenses. She also testified that she and her family lost their home as a result of the denial of benefits and termination of employment.

*Southwest Miss. Reg'l Med. Ctr. v. Lawrence*, 684 So.2d at 1269.

¶31. We take this opportunity to clarify the burden for recovery of mental anguish and emotional distress in breach of contract actions. Plaintiffs may recover such damages without proof of a physical manifestation. *Adams v. U.S. Homecrafters, Inc.*, 744 So.2d 736, 743 (Miss. 1999). Furthermore, expert testimony showing actual harm to prove mental injury is not always required. *Gamble v. Dollar Gen. Corp*., 852 So.2d 5, 11 (Miss. 2003). However,

19

the plaintiff must show (1) that mental anguish was a foreseeable consequence of the particular breach of contract, and (2) that he or she actually suffered mental anguish. Such generalizations as "it made me feel bad," or "it upset me" are not sufficient. A plaintiff must show specific suffering during a specific time frame. These requirements are not different from the requirements to establish physical pain and suffering.

¶32. We have previously held that, "evidence consisting solely of a claim of sleeplessness and mental anguish did not demonstrate an actual injury with sufficient certainty to warrant compensation." *Morrison v. Means*, 680 So.2d 803, 806-07 (Miss. 1996). We then clarified this holding in *Whitten v. Cox*, 799 So.2d 1, 10-11 (Miss. 2000)), by pointing out that testimony concerning "discomforts" such as sleeplessness and irritability take on a different importance when viewed in light of the event which engendered the mental anguish. In *Whitten*, we recognized greater significance to such terms because of the event[8] which caused them.

¶33. Thus, "the nature of the incident" can be important in two ways. First, understanding the nature of the incident is essential in establishing whether emotional distress is foreseeable. Additionally, in cases where the defendant's conduct is more egregious, the plaintiff's burden of establishing specific proof of suffering will decrease. Nevertheless, the burden is there, and a plaintiff seeking emotional distress damages for a breach of contract must provide more than general declarations of emotional distress.

---

[8] The plaintiffs received death threats from an armed man who shot at their vehicle, handcuffed them, and took them prisoner.

¶34. In the case before us, we have no doubt that Williams presented sufficient proof of emotional distress caused by USM's failure to fulfill its contractual obligations. Furthermore, she was denied the fruits of her many years of academic labors.

¶35. We must point out that Williams mentioned several times in her testimony the emotional effects Stamper's actions had on her. Specifically, Williams testified about the assault in her home and its effects on her mental and emotional well-being. Williams testified that later that evening, she actually considered suicide, and had her gun in her hands, but that her son was able to wrestle the gun away from her. In addition to the assault by Stamper, Williams testified to harassing phone calls and a shadowy figure outside her bedroom window in the late night/early morning hours.

¶36. Regarding the effects of USM's actions preventing her from defending her dissertation, Williams testified to "[t]he lack of guidance, the game playing and repeated sexual harassment that I suffered in connection with my dissertation, and it's taken a great toll on me, it's a paralyzing trauma. Even now, the word dissertation evokes strong feelings of dread, disgust, anxiety, anger, and so forth, within me."

¶37. Other persons also testified to the mental and emotional effects the defendants' actions had on Williams. Dr. Darlys Alford, Williams's colleague, professor at USM, and licensed professional counselor, testified that after the assault by Stamper "[Williams] was very reluctant to go to the University because she had been traumatized; she was very upset about it, . . . ." Alford also testified, "I was her friend, and I was very concerned about her because she was under a lot of stress. She was not sleeping very well and she talked about this problem all of the time. It was hard for her to focus on her work and to do her job."

21

¶38.    Additional testimony as to the effects of the defendants' actions on Williams's mental and emotional well-being came from Williams's son, Heath, and her husband, David Greenwell. Heath Williams testified, "[Williams] was unbearably stressed out already.    During the course of the summer . . . it really felt like, it was like being under siege if you can understand . . . there were telephone calls and everything.    It just seemed constant, you know . . . [t]here didsn't seem to be any end to the harassment that was going on.    And of course she was afraid most of the time."  David Greenwell testified:

> Well, to be specific, she suffered a tremendous trauma, but it is exhibited in her behavior in the need of having a safe environment, a person around her who could give her security . . . .    So it would reinforce a sense of a lost safety and security in her.
>
> She suffered tremendous insomina [sic], clinched hands, but in the household itself, like telephone ringing, knock on the door, or just going outside, I call it hypervigilance, being aware of her surroundings, making sure that she is safe or feels safe.

¶39.    Under these facts, if they are accepted and believed by a properly instructed jury, we find mental anguish and emotional distress for the breach of contract to be both foreseeable and recoverable.    However, Williams's right to recover damages from USM for mental anguish and emotional distress springs only from the breach of contract, not from the tortious conduct of Stamper.

¶40.    There is a fine line between Stamper's objective wrongful conduct and his subjective impact on the entire academic climate or environment of which he was an integral part.    Thus, upon retrial, the jury must be carefully instructed to separate any mental anguish and emotional distress caused by Stamper's assault and unauthorized tortious conduct, and award damages,

if any, for mental anguish and emotional distress only for the breach of contract, that is, only for Williams's denied opportunity to receive her doctorate.

### III.    Denial of JNOV re: Mississippi Tort Claims Act

¶41.    USM and the professors also moved for judgment notwithstanding the verdict arguing that the Mississippi Tort Claims Act, Miss. Code Ann. § 11-46-7(1) et seq., provides that the MTCA is the exclusive remedy for the damages sought by Williams, which clearly sound in tort.   They argue that the proper vehicle for the relief sought by Williams against USM and the professors is the MTCA.   Their primary argument was that the trial by jury, which was in contravention of the plain language of the statute, was manifest error.   Citing Miss. Code Ann. § 11-46-13(1), USM argued:

> trial of any and all torts is to the bench and not a jury.  The waiver of immunity by the Legislature contains certain limitations, including the requirement that the Court be the finder of fact.  Failure to comply with the statute destroys the Court's jurisdiction in this matter.  The jury in this case heard and considered evidence that dealt exclusively with torts such as trauma, assault, sexual harassment, trespass, emotional distress, harassing telephone calls, and other such claims. . . .

¶42.    The record clearly reflects that the parties considered separating the jury issues: namely, the § 1983 claim and the contract claim, from the tort claims.   Just how they planned to accomplish this is anything but clear.   According to USM:   "While there was much discussion among the lawyers and the Circuit Judge regarding the proper procedure for handling this case, the record is not clear in this regard."   Williams's attorney, in response to USM's motion for directed verdict, stated:   "[T]he MTCA issues are not for the jury as his Honor is aware.   In my personal experience in other jurisdictions, the Court often takes those

23

under advisement and simply addresses those later . . . ." Later, in response to USM's motion for judgment notwithstanding the verdict, Williams stated:

> It is also inappropriate and highly inaccurate for the Defendants to contend that the Mississippi Tort Claims Act (MTCA) had any bearing on the jury's verdict since no torts were presented to the jury. It was announced by Plaintiff's counsel in open court, in Chambers to the court and to counsel opposite, and to counsel opposite personally that the Court, not the Jury, would be addressing the tort issues. . . . The Court will, in due course, resolve all issues regarding tort relief if any.

¶43. Notwithstanding this pronouncement, tort claims were clearly before the jury, and the circuit court gave the following instruction:

> Among the elements of injury and harm for which compensation may be awarded are: emotional harm, if any, to Davida Williams during and after the damages received, including emotional distress, humiliation, personal indignity, embarrassment, fear, anxiety, and/or anguish which Davida Williams suffered . . . .

Thereafter, the jury returned a general verdict in favor of Williams in the sum of $800,000 "actual damages." Obviously, the circuit court did not "in due course resolve all issues regarding tort relief," but rather simply entered a final judgment based entirely on the jury's general verdict.

¶44. While USM and the professors, in their answer, properly raised the affirmative defense that the MTCA was the exclusive remedy for the harms alleged by Williams, they did not seek pre-trial adjudication of that issue. They readily submitted jury instructions yet in their post-trial arguments rely primarily on the jury issue.

¶45. Our review of the record reveals that there was a total absence of any effort or intent on behalf of Williams to comply with the Mississippi Tort Claims Act. No notice of claim as required by Section 11-46-11 was ever filed. Thus, the statute of limitations has long since

24

run, and any recovery under the tort claims act is barred. We again emphasize that the decision to totally ignore pursuit of a Mississippi Tort Claims Act suit and to opt instead to pursue a contractual or other claim of recovery for damages, is appropriate only in rare circumstances. If the plaintiff so chooses and is unable to meet the stringent requirements for recovery on other theories, the decision may result in no damages awarded to the plaintiff.

### IV. Remittitur or Remand

¶46. USM asks for a remittitur to the $50,000 damage cap which would be the maximum available had this matter been tried under the Tort Claims Act, or in the alternative, a new trial. After considering both options, we conclude that the damages awarded were too speculative based upon the evidence presented at trial. When the focus is on a monetary remedy, that remedy must be such that the breaching party is not charged beyond the trouble the breach caused. *Frierson v. Delta Outdoor, Inc.*, 794 So.2d 220, 225 (Miss. 2001) (citing *Wall v. Swilley*, 562 So.2d 1252, 1256 (Miss. 1990)). The law limits speculation and conjecture and imposes duties of mitigation to the injured party. *Id.* Specifically, damages may only be recovered when the evidence presented at trial "removes their quantum from the realm of speculation and conjecture and transports it through the twilight zone and into the daylight of reasonable certainty." *Id.*

¶47. We hold that there was a valid contract between USM and Williams and that USM breached the contract and is, therefore, liable for damages arising from that breach. However, the damages awarded at trial were too speculative, and the evidence insufficient to be relied upon as proof for such damages.

### CONCLUSION

25

¶48. We conclude that the circuit court should have granted USM's motion for JNOV regarding Williams's § 1983 claim and regarding the applicability of the Mississippi Tort Claims Act. We affirm the trial court's denial of USM's motion for JNOV regarding Williams's contract claim. We reverse the judgment awarding damages, and we remand this case for a new trial consistent with this opinion and limited to the sole issue of Williams's damages arising from USM's breach of contract.

¶49. **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**WALLER, P.J., CARLSON AND DICKINSON, JJ., CONCUR. SMITH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ, GRAVES AND RANDOLPH, JJ., NOT PARTICIPATING.**

**SMITH, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶50. I agree with the majority regarding the dismissal of the 42 U.S.C. § 1983 claim and that recovery under the Mississippi Torts Claims Act, Miss. Code Ann. §§ 11-46-1 to 11-46-23 (Rev. 2002 & Supp. 2004), is barred. I also agree that Williams does have a cause of action for breach of contract and mental anguish resulting from the breach. However, I disagree with the result the majority reaches. I would reverse and remand for a new trial on both liability and damages on the breach of contract claim. Therefore, I respectfully dissent in part.

¶51. The damages awarded in this convoluted trial, as the majority points out, were too speculative based upon the evidence presented at trial. However, the majority reverses and remands for a new trial only on the issue of damages. The majority fails to recognize that this damage award clearly evinces bias and prejudice on the part of the jury. In my view, allowing

evidence of the torts associated with the Mississippi Torts Claim Act infected the entire trial. This Court cannot reasonably ascertain whether the jury found actual liability or was prejudiced by the introduction of the torts that should never have been brought before the jury because they were barred under the Mississippi Torts Claim Act. The result would have been vastly different had the jury only been allowed to consider the breach of contract issue and the torts associated with the mental anguish resulting from the breach.

¶52. In my separate opinion in *Gamble v. Dollar General Corp.*, 852 So.2d 5, 21 (Miss. 2003) (Smith, P.J., concurring in part and dissenting in part), I concluded that the damage was already done because the extensive prejudicial and irrelevant evidence was already placed before the jury, and I would have reversed and remanded for a new trial on the issue of liability and damages. This is the same situation in the case sub judice. The trial judge allowed all of the issues to be tried together, and this improper evidence clearly influenced the jury as shown by the amount of damages the jury awarded to Williams.

¶53. In *Gamble*, I cited a Third Circuit case which held that evidence submitted on one claim can have an improper effect on another claim. *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476 (3d Cir. 1997). In that case the district court found that Rush's failure to promote and train claim was not time barred. *Id.* at 483. The Third Circuit reversed the district court finding that the failure to promote and train claim was time barred and the introduction of evidence with respect to this claim infected the entire trial. *Id.* at 480. It held that "the presence of the failure to promote and train claim and the introduction of evidence related to and supporting that claim infected the jury's liability verdicts on the sexual harassment and constructive discharge claims as well as the verdict for the damages." *Id.* at 485.

27

¶54.    As the majority correctly points out, the tort claims under the Mississippi Torts Claim Act are barred.  It is obvious from the record that both the plaintiff and defendants treated this case as a Tort Claims Act case and proceeded to trial with the understanding that the trial judge would ultimately decide the Tort Claims Act issue separate from the jury.  However, evidence of those torts was wrongly brought before the jury.  In my view, the admission of this evidence infected the entire trial as to both liability and damages.  As the court in **Rush** held and as I stated in my separate opinion in **Gamble**, the introduction of the evidence relating to the claim infected the jury's liability verdict as well as the verdict for damages.  It is also not possible to ascertain what portions of the damages were attributable to the time-barred torts claim.  Furthermore, I am unable to find that the evidence of the time-barred torts action did not affect the jury's verdict on liability as to the other claims.  I would therefore reverse and remand for a new trial on both liability and damages on the breach of contract claim.

¶55.    For these reasons, I respectfully concur in part and dissent in part.

### EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:

¶56.    I respectfully concur in part and dissent in part with the majority's opinion today.

¶57.    In the second issue entitled as the "denial of JNOV re: Williams's contact claim" the majority addresses a breach of contract claim and whether a plaintiff can recover for mental anguish and emotional distress.  Indeed, the majority finds that, despite conflicting testimony, "there is sufficient evidence that USM and its employees breached the duty of good faith and fair dealing in their relationship with Williams."  The majority also holds that "[t]here is evidence that USM and its employees knowingly conducted themselves in ways which violated standards of decency, fairness, and reasonableness."  I agree.

28

¶58. The majority attempts to clarify the emotional distress issue for breach of contract actions. While the majority found that a claim for mental anguish and emotional distress for the breach of contract to be both foreseeable and recoverable, the majority found that Williams could only recover damages from USM for breach of contract and not the tortious conduct of Stamper.

¶59. Arguably, the majority is correct in determining that USM is not responsible for the initial assault by Stamper. However, in order for a jury to have a clear understanding of the full scope of breach of contract and the mental anguish and emotional distress issues, I believe that the jury is entitled to hear about the tortious act. Otherwise, the jury will not have an understanding of the foundation of Williams's claims. The majority alludes to carefully constructed jury instructions. This suggestion is not without merit. However, I am concerned that the jury needs full knowledge of the tortious actions of Stamper and other staff, in order to make a properly informed decision on the breach of contract and mental anguish and emotional distress issues as pertain to any potential liability on the part of USM.

¶60. USM was *put on notice numerous times* concerning the actions of its employees, Stamper and others. USM did nothing to stop the actions of its staff from impeding Williams in her pursuit of a Ph.D. USM had knowledge of its staff's actions which ultimately hindered Williams from receiving her diploma and USM refused to protect and assist its student in completing her education despite knowing the actions of its staff. USM allowed its staff to continue to act in an inappropriate, unprofessional manner toward its student and therefore acquiesced to staff behavior to the detriment of its student.

¶61. Here, Williams testified that she complained to Dean Harper and to the English Department Chair Wheeler concerning Stamper's actions. Indeed, Williams notified USM on a number of occasions that she was having problems with USM staff. These actions would consequently affect her ability to receive her diploma. Williams claimed that Stamper went to her home to discuss dissertation revisions in August or September 1990 and also assaulted her. Williams promptly reported the incident to Dean Harper, the Dean of the College of Liberal Arts and Dr. Wheeler. Thus, USM was on notice of the actions of Stamper that ultimately interfered with the receipt of her diploma. Part of an agreement was to remove Stamper from her dissertation committee. However, Stamper later testified that he was not notified of his removal from her committee. Another professor testified that USM never notified him that he was now on Williams's committee.

¶62. In May 1991, Williams again notified Dean Harper of another staff's inappropriate behavior and informed him of Stamper's continued unwanted contacts. In December 1995, Williams yet again sent a letter to Dean Harper informing him that she was still being harassed and asking for his assistance. In January 1996, a graduate director responded to Williams's concerns expressing sympathy but providing no assistance or resolution for Williams's complaints. Further, Williams attempted to contact McCraw, the newly assigned dissertation chair, for four years without any response. Williams finally had a meeting with USM personnel. USM failed to follow-up on the meeting. Following this, Williams requested a status report and received no response. Therefore, she filed suit.

¶63. Again, it is arguable that USM had nothing to do with the initial assault by Stamper. However, the above facts demonstrate that Williams promptly placed USM on notice of

Stamper's actions. It is disputed as to whether Williams told USM official of an "assault" or merely inappropriate behavior. Nevertheless, USM had almost immediate notice of these actions. Once USM had notice of these actions, including continued actions by Stamper and subsequent actions by various other staff members, USM did nothing to assist Williams with these hindrances and obstacles to her diploma. While carefully constructed jury instructions may be warranted, the jury also has to have an opportunity to truly appreciate the nature of the actions or lack there of by USM in confronting the problems Williams faced and her eventual inability to obtain her diploma.

¶64. USM's indifference to the adverse conduct towards Williams sends a terrible message to all women on every college campus. USM had a duty to protect all of its students and staff, regardless of gender or position. Discrimination and harassment by USM staff towards a student cannot be tolerated. USM's actions or lack of action in this case has made Williams a victim. I would affirm the denial of the JNOV. In addition, I would remand to the trial court on the issue of damages and allow the jury to hear the complete facts, including the tortious acts of Stamper, in order for the jury to have a thorough understanding of Williams's basis for her breach of contract claim. For the above reasons, I must respectfully concur in part and dissent in part.